IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Christine M. Arguello**

Civil Action No. 08-cv-00238-CMA

CINDY L. WENDELIN,

    Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

    Defendant.

---

## ORDER REGARDING SSA DECISION

---

Pursuant to 42 U.S.C. § 405(g), Plaintiff Cindy Wendelin appealed from the denial of disability benefits by the Social Security Commissioner ("Commissioner"). After a hearing on Plaintiff's application, the Administrative Law Judge ("ALJ") found that Plaintiff was not "disabled" within the meaning of the Social Security Act ("Act") because Plaintiff could perform gainful work within the regional and national economies despite her arm injury.

## BACKGROUND

### I. MEDICAL HISTORY

Plaintiff was born March 14, 1957. She has a high-school education and a certificate in floral design. She can speak and understand English. She has previously been married and divorced and the record indicates that she was engaged to be

married during much of the time period at issue. The record does not contain any reference to children.

Plaintiff's primary disability complaint concerns pain and numbness in her right arm. (Administrative Record (hereafter, "Admin.") at 67.) In May 2004, she had a surgical hysterectomy.[1] (*Id.* at 124.) After the surgery, she began to experience pain and numbness in her right arm that she did not have before. (*See, e.g., id.* at 134, 136.) Records of visits to Plaintiff's doctor, Matthew Morgan, D.O., indicate that Plaintiff complained of near-constant pain, some reduction in range of motion, and intermittent swelling in Plaintiff's right arm. (*Id.* at 137-47.) Plaintiff also started taking pain medication in varying doses, which she claimed helped her sleep at night, but affected her concentration during the day. (*See, e.g., id.* at 175.) At first, Dr. Morgan theorized that the pain might be related to phlebitis (inflammation of the vein). However, by August 2004, Dr. Morgan assessed Plaintiff as having "RSD," which is short for Reflex Sympathetic Dystrophy, a form of Complex Regional Pain Syndrome.[2] (*Id.* at 135.) He referred her to a second treating doctor, Lawrence Lesnak, D.O., for further examination.

---

[1] Plaintiff also had hypertension and acid reflux, but she does not contend that these conditions limited her ability to work or contributed to her disability. (*Id.* at 126.)

[2] Complex Regional Pain Syndrome ("CRPS") is a syndrome believed to be related to the sympathetic nervous system that can appear after a bone or soft tissue injury. (Doc. # 21 at 5 n. 4.) There are two types of CRPS: Type I is known as Reflex Sympathetic Dystrophy ("RSD") and occurs when there has been no injury to the nerve. Type II is sometimes known as Causalgia and occurs when there is a demonstrable nerve injury. (*Id.*)

In September 2004, Dr. Lesnak found "[p]ossible peripheral nerve entrapment neuropathy involving the right upper extremity, specifically the right median nerve across the right wrist." (*Id.* at 161.) Based on EMG evidence, he found signs of "mild" neuropathy in October 2004. (*Id.* at 158.) However, Dr. Lesnak stated that there was "[n]o evidence of autonomic dysfunction – CRPS/RSD." (*Id.* at 154.) At a follow up visit in February 2005, Dr. Lesnak found that Plaintiff's "strength essentially remained 5/5 in her upper extremities bilaterally including wrist extension activities. She continued to have a small amount of swelling in the dorsum of her right hand and wrist, but there was no evidence of any type of skin temperature or color change or abnormal hair growth involving the upper extremities bilaterally." (*Id.* at 152.) He repeated an EMG test and confirmed the "right radial neuropathy" diagnosis in July 2005. (*Id.* at 150 and 165.) But again, Dr. Lesnak found that Plaintiff had "full range of motion" and that she did not present with any evidence of "soft tissue abnormalities . . . ." (Doc. # 20, Ex. A.)

The EMG evidence appears to be the only objective diagnostic evidence to support Plaintiff's subjective complaints of severe pain and numbness. For example, like Dr. Morgan's records, Dr. Lesnak's records indicate that Plaintiff typically presented with full range of motion, lack of edema, and no evidence of any type of skin discoloration or temperature change. (*See, e.g.,* Admin. at 154 &175.) This lack of objective symptoms suggests a negative diagnosis for CRPS. (Doc. # 21 at 5 n. 4.) Further, a March 2005 "Quantitative Autonomic Evaluation Report" by George Schakaraschwili, M.D., indicated a "low probability for the presence of complex regional

pain syndrome." (Admin. at 178.) Thus, in finding that Plaintiff's subjective complaints of pain were not fully supported by objective testing, Dr. Schakaraschwili agreed with Dr. Lesnak's initial impressions from October 2004.

Yet, in the most recent record from March 2007, Dr. Lesnak concluded that Plaintiff had "chronic right radial neuropathy – 'Causalgia.'" (*Id.* at 197.) This record reflects that Dr. Lesnak has either retreated from his October 2004 diagnosis or that he is using "Causalgia" to mean something different than Type II CRPS. Despite the apparent conflict between the medical records and the lack of objective symptoms, Plaintiff's treating doctors noted on at least three occasions that there was no evidence that Plaintiff was "malingering." (*Id.* at 165, 194 & 197.)

Plaintiff also submitted additional records from Dr. Lesnak from July 2005 and October 2005 with her appellate brief. Like Dr. Lesnak's earlier records, these reports indicate mild neuropathy on the basis of "previous EMG evidence." However the records also state there is no evidence of complex regional pain syndrom and that Plaintiff "continued to have essentially 5/5 strength in her up extremities bilaterally, although she did exhibit some give-way weakness secondary to pain at times." (*See* Doc. # 20, Exs. A & B.) The ALJ did not consider these records in his decision.

Plaintiff's own description of her daily activities indicated that she could perform simple daily tasks like cooking, dressing herself, personal grooming, laundry, house cleaning, personal finance, etc. (Admin. at 76.) She stated that she read the newspaper and magazines, took walks, visited with family and friends, watched some

4

television and shopped with her fiancé.  (*Id.*)  However, she stated that her pain made these tasks more difficult and she only drove when absolutely necessary because the pain medication and lack of strength made her too risky on the roads.  (*Id.* at 79.)

## II.     PROCEDURAL HISTORY

Plaintiff filed her application for benefits on May 31, 2005.  (*Id.* at 37.)  She claimed that she had been unable to work since May 10, 2004, the date of her surgery.  (*Id.*)  The Commissioner denied her request and she timely requested a hearing before the ALJ.  The ALJ held a hearing on March 15, 2007, and issued an opinion denying benefits on April 10, 2007.  (*Id.* at 10A.)  The Appeals Council denied Plaintiff's request for review on November 30, 2007, and Plaintiff sought review in this Court in February 2008.

### A.     The ALJ Hearing

At the hearing, Plaintiff and the Commissioner's Vocational Expert, Pat Pauline, testified.

#### 1.     Plaintiff's Testimony

Plaintiff testified regarding her work history, which included owning her own flower shop.  At her shop, she made all the management decisions, designed floral arrangements, answered the phones, used the computer and occasionally lifting up to twenty-five pounds.  (*Id.* at 215.)  After she closed the flower shop in February 2001, Plaintiff worked various jobs in the administrative and customer service sectors for three or four different companies up until her final employment with McKesson Corporation.

5

(*Id.* at 219.) These jobs were desk jobs that required Plaintiff to sit at a desk and operate a computer or telephone. (*Id.* at 218-19.) She did very little lifting at these jobs. (*Id.*)

Plaintiff also testified regarding her pain symptoms. She stated that she was right-handed and had pain "in between [her] second and third finger" on her right hand that would radiate up towards her elbow. (*Id.* at 220-21.) She also stated that she had numbness, which had increased in the six months preceding the hearing and that the numbness would wake her up at night. (*Id.* at 221.) She said that her pain registered at a level of around seven to eight on a normal basis, with zero being no pain and ten being pain that would lead someone to seek immediate treatment. (*Id.* at 223.) Plaintiff testified that the pain caused her trouble dressing, brushing her teeth, and putting her make-up on and that she uses her left hand to eat, cook, and do other household chores. (*Id.* at 224.) She also stated that, aside from her right arm pain, she had plantar fasciitis in both feet and bursitis in her right hip. (*Id.* at 227-28.)

        2.        <u>Vocational Expert's Testimony</u>

The vocational expert, Ms. Pauline, testified regarding the vocational characteristics of Plaintiff's previous work and the work available in the national economy for a hypothetical person with limitations like those alleged by Plaintiff. Notably, Ms. Pauline testified that the following hypothetical person could not perform Plaintiff's previous jobs: a person who could occasionally lift twenty and frequently lift ten pounds with the non-dominant arm; occasionally lift ten and frequently lift less than

ten pounds with the dominant arm; stand, walk and sit for up to two hours before a break for a total standing or sitting time of six hours per day; occasionally push or pull with the dominant arm; not climb ladders or scaffolding; not work at unprotected heights; occasionally be exposed to extreme cold; occasionally climb stairs and ramps; frequently balance, stoop, kneel, and crouch; only occasionally crawl; and occasionally handle, finger, reach, and feel with the dominant arm. (*Id.* at 233.)

However, Ms. Pauline stated that a person with these vocational considerations could work in the national economy. The jobs available to such a person included: school bus monitor, surveillance system monitor, callout operator, usher, and counter clerk. (*Id.* at 233-34.) Ms. Pauline stated that a hypothetical person with even more severe limitations on the dominant arm – no handling, fingering and feeling – could also find work as a surveillance system monitor and school bus monitor. (*Id.* at 236.) A third hypothetical person with the above-mentioned occasional restrictions on the dominant arm, who could stand or walk only one hour before a break would still have available work, but not as an usher or counter clerk. (*Id.*) None of the jobs identified by Ms. Pauline were "production oriented." (*Id.* at 238.)

### B. The ALJ's Decision

The ALJ found that Plaintiff was not disabled within the meaning of the Act because, despite her impairment, she could perform work in the regional and national economies. More specifically, the ALJ found:

(1) Plaintiff met the insured status requirements from May 10, 2004 through December 31, 2006;

(2) Plaintiff had not engaged in substantial gainful activity since May 10, 2004;

(3) Plaintiff had a severe impairment, the right neuropathy, but that the impairment did not meet the criteria of a presumptively disabling impairment;

(4) Plaintiff had a high-school education and skilled work experience, but was unable to perform her past relevant work;

(5) Plaintiff was not fully credible;

(6) Plaintiff had a residual functioning capacity ("RFC") to occasionally lift twenty and frequently lift ten pounds with the non-dominant arm, occasionally lift ten and frequently lift less than ten pounds with the dominant arm, stand, walk and sit for up to two hours before a break for a total standing or sitting time of six hours per day, occasionally push or pull with the dominant arm, not climb ladders or scaffolding, not work at unprotected heights, occasionally be exposed to extreme cold, occasionally climb stairs and ramps, drive a motor vehicle, frequently balance, stoop, kneel and crouch but only occasionally crawl and occasionally handle, finger, reach and feel with the dominant arm; and

(7) Plaintiff could perform work in the national economy including a bus monitor, surveillance system monitor, usher, call out operator and counter clerk.
(*Id.* at 10L.)

## STANDARD OF REVIEW

Section 405(g) of the Social Security Act establishes the scope of this Court's review of the Commissioner's denial of disability insurance benefits. *See* 42 U.S.C. § 1383(c)(3) (2006) (incorporating review provisions of 42 U.S.C. § 405[g]). Section 405(g) provides, in relevant part, that:

> [t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied by the Commissioner of Social Security or a decision is rendered under subsection (b) of this section which is adverse to an individual who was a party to the hearing before the Commissioner of Social Security, because of failure of the claimant or such individual to submit proof in conformity with any regulation prescribed under subsection (a) of this section, the court shall review only the question of conformity with such regulations and the validity of such regulations.

42 U.S.C. § 405(g). Thus, this Court's review is limited to determining whether the record as a whole contains substantial evidence supporting the Commissioner's decision. *See* § 405(g); *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992). The Court must uphold the Commissioner's decision if it is supported by substantial evidence. See *Dollar v. Bowen*, 821 F.2d 530, 532 (10th Cir. 1987). This Court cannot re-weigh the evidence nor substitute its judgment for that of the ALJ. *Jordan v. Heckler*, 835 F.2d 1314, 1316 (10th Cir. 1987). That does not mean, however, that review is merely cursory. To find that the ALJ's decision is supported by substantial evidence, the record must include sufficient relevant evidence that a reasonable person might deem adequate to support the ultimate conclusion. *Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987). A decision is not based on

substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it. *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985). The ALJ's decision is also subject to reversal for application of the wrong legal standard. *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Frey*, 816 F.2d at 512.

## **ANALYSIS**

Under the standard of review described above and the applicable law described below, the Court affirms the ALJ's decision.

## III. APPLICABLE LAW

A claimant must qualify for disability insurance benefits under the Social Security Act. To do so, the claimant must meet the insured status requirements, be less than sixty-five years of age and under a "disability." *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991). The Social Security Act defines a disability as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). In proving disability, a claimant must make a prima facie showing that she is unable to return to the prior work she has performed. *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988). Once the claimant meets that burden, the Commissioner must show that the claimant can do other work activities and that the national economy provides a significant number of jobs the claimant could perform. *Frey*, 816 F.2d at 512.

The Commissioner has established a five-step process to determine whether a claimant qualifies for disability insurance benefits. *See* 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987) (describing five-step analysis). A claimant may be declared disabled or not disabled at any step; and, upon such a determination, the subsequent steps may be disregarded. *See* 20 C.F.R. § 404.1520(a); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988). First, the claimant must demonstrate that she is not currently involved in any substantial gainful activity. 20 C.F.R. § 404.1520(b). Second, the claimant must show a medically severe impairment (or combination of impairments) which limits her physical or mental ability to do basic work activities. § 404.1520(c). At the third step, if the impairment matches or is equivalent to established listings, then the claimant is judged conclusively disabled. § 404.1520(d). If the claimant's impairments are not equivalent to the listings, the analysis proceeds to the fourth step. At this stage, the claimant must show that the impairment prevents her from performing work she has performed in the past. *See Williams*, 844 F.2d at 751 (citations omitted). If the claimant is able to perform her previous work, she is not disabled. 20 C.F.R. § 404.1520(e); *Williams*, 844 F.2d at 751. The fifth step requires the Commissioner to demonstrate that: (1) the claimant has the RFC to perform other work based on the claimant's age, education, past work experience; and (2) there is availability of that type of work in the national economy. *See* 20 C.F.R. § 404.1520(f); *Williams*, 844 F.2d at 751.

## IV. THE ALJ MADE THE CORRECT DISABILITY DETERMINATION.

Plaintiff argues the ALJ erred on five overlapping issues, the ALJ: (1) failed to give proper weight to the findings and opinions of Plaintiff's treating physicians; (2) substituted his own opinion for the medical evidence; (3) failed to re-contact the treating physicians for clarification; (4) failed to properly assess Plaintiff's credibility in light of the medical evidence; and (5) relied on Ms. Pauline's responses about the existence of jobs to deny benefits based on a hypothetical question that failed to incorporate all of Plaintiff's exertional and nonexertional limitations.

### A. Substantial Evidence Supports the Weight Given the Opinions of Plaintiff's Treating Physicians.

A treating physician's opinions are generally given controlling or considerable weight in reviewing a disability claim. *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003). If the ALJ decides not to give a treating opinion controlling weight, the opinion is still entitled to deference and the ALJ must weigh the factors in 20 C.F.R. § 404.1527(d)(2) (factors include the length, frequency, nature, and extent of treatment relationship). If the ALJ completely rejects the treating opinion, he must give specific, legitimate reasons for doing so. *Watkins*, 350 F.3d at 1300. The ALJ should only reject a treating physician's opinion if the record contains medical evidence that contradicts the treating opinion. *Robinson v. Barnhart*, 366 F.3d 1078, 1082 (10th Cir. 2004). Lay opinion or questions regarding credibility are not sufficient to reject a treatment opinion. *Id.* The converse is also true – examining opinions are entitled to less weight

than treating physicians and agency opinions from individuals who have never seen the claimant are entitled to the least weight of all. *Id.* at 1084.

In this case, Plaintiff argues that the ALJ should have, but did not give controlling weight to the opinions of Drs. Morgan and Lesnak, Plaintiff's treating physicians. However, this argument is not supported by the facts. A review of the record reflects that Drs. Lesnak and Schakaraschwili did not agree or at least questioned Dr. Morgan's diagnosis of CPRS. Multiple reports from Dr. Lesnak and the sole report from Dr. Schakaraschwili indicate a low probability of CPRS. Dr. Lesnak's unsupported report indicating "Causalgia" only adds to the conflict in the record upon which the ALJ based his decision. Thus, the ALJ's decision not to give Dr. Morgan's opinion controlling weight pursuant to § 404.1527(d)(2) is supported by substantial evidence.

The ALJ also declined to give controlling weight to Dr. Lesnak's opinion. Admittedly, the ALJ stated that Plaintiff had not seen Dr. Lesnak since May 2005, a gap the ALJ described as almost two years, when in fact the gap was more like 16 months. However, the ALJ did not reject Dr. Lesnak's opinion solely on the ground that Plaintiff had not seen Dr. Lesnak in "nearly two years." The gap in treatment was a factor in the ALJ's decision to not give Dr. Lesnak's opinion controlling weight, but it was not the only factor. In declining to afford controlling weight to Dr. Lesnak's opinion, the ALJ also relied on the substantial inconsistencies in the record. For example, Dr. Lesnak's own records initially stated that the was no evidence of CRPS. (Admin. at 154.) However, years later, and with very little additional objective testing to prove it, Dr. Lasnak

reported that Plaintiff might indeed have Type II CRPS, or "Causalgia." (*Id.* at 197.) Further contradictory evidence comes from Dr. Schakaraschwili, who performed a series of objective tests and concluded that Plaintiff had a "low probability for the presence of complex regional pain syndrome." (*Id.* at 178.) These inconsistencies in the record provide substantial evidence to support the ALJ's decision to not give controlling weight to the opinions of Dr. Lesnak. *See* SSR 96-2p, 1996 WL 374188 at *2 (1996) (noting that an ALJ cannot afford controlling weight to treating opinion that "is inconsistent with the other substantial evidence in the case record").

Moreover, the ALJ did not completely discredit Dr. Morgan and Dr. Lesnak's opinions. He noted that both doctors were undisputed in their opinion that Plaintiff suffers from pain and that it impacts her ability to concentrate. He could and did adopt these undisputed portions of their opinions and factor them into his RFC assessment without methodically and mechanically spelling out the § 404.1527(d)(2) factors.

Thus, the record supports the ALJ's decision not to give controlling weight to Plaintiff's treating physicians and his failure to mechanically apply each of the elements in § 404.1527(d)(2) is not grounds to overturn his decision. *See Pisciotta v. Astrue*, 500 F.3d 1074, 1078 (10th Cir. 2007).

> **B. The ALJ Properly Calculated Plaintiff's RFC Based on the Entire Record And Properly Evaluated The Non-Medical Evidence.**

Plaintiff also contends that the ALJ "cherry picked" medical evidence from the record to support his decision without taking into account contradictory medical facts that supported Plaintiff's position. Plaintiff is correct that the ALJ cannot "pick and

14

choose from a medical opinion, using only those parts that are favorable to a finding of nondisability." *Robinson*, 366 F.2d at 1083. However, Plaintiff's argument on this point also fails because the ALJ did not substitute his opinion for medical evidence; he merely rejected Plaintiff's subjective (*i.e.*, non-medical) complaints on the basis that she lacked credibility. This is something the ALJ is entitled to do and this court should not re-weigh his analysis. *See Kelley v. Chater*, 62 F.3d 335, 337 (10th Cir. 1995) (the court may not re-weigh the evidence nor substitute its discretion for that of the Commissioner).

The ALJ's decision states, "While [Plaintiff] establishes the nexus required under Luna [v. Bowen, 834 F.2d 161 (10th Cir. 1987)], that [Plaintiff's] impairments could reasonably be expected to produce some of the symptoms alleged, support for the claimant's allegations as to the frequency, intensity and persistence of these symptoms is lacking in the record. . . . The objective medical record does not contain clinical signs and findings to support the severity of symptoms [Plaintiff] asserts." (Admin. at 10I-10J.) This quoted passage from the ALJ's decision reflects that the ALJ did not cherry pick from objective medical evidence, but instead he accepted all of the consistent, credible medical evidence as true, while rejecting Plaintiff's inconsistent, subjective claims of debilitating pain. This is the type of credibility determination that this Court cannot re-evaluate on appeal. *See Kelley*, 62 F.3d at 337.

Moreover, a review of the record indicates that the ALJ's decision to reject Plaintiff's subjective non-medical complaints is supported by substantial evidence. Plaintiff's own testimony indicates that her daily activities do not comport with her

15

description of near constant, almost unbearable pain. (*Id.* at 76-83.) Plaintiff's Function Report indicated that she could care for herself, do laundry, water the yard and clean the house. The ALJ described how these activities are not consistent with allegations of constant, debilitating pain. (*Id.* at 10G.) Thus, his decision was support by substantial evidence.

Also, contrary to Plaintiff's argument, the ALJ did not reject Plaintiff's subjective claims based solely on her daily activities. In fact, the medical records from Drs. Lesnak and Morgan repeatedly confirm that despite evidence of "mild" neuropathy in her right arm, Plaintiff had essentially full strength in her upper extremities, full range of motion, only intermittent swelling and no skin discoloration, unusual temperature changes or other objective, outward symptoms that would support her subjective complaints. (*Id.* at 154 & 175.) These findings are repeated throughout the record. So, even if, as Plaintiff contends, the ALJ was incorrect to state that Plaintiff's pain symptoms were not improving, the consistent medical evidence does not support her subjective claims of pain. As such, the Court finds substantial evidence to support the ALJ's rejection of Plaintiff's non-medical evidence as part of his assessment of Plaintiff's credibility.

**C.     Plaintiff's Newly Submitted Evidence Does Not Require Remand.**

Plaintiff submitted four additional pages of medical records from Dr. Lesnak from July 2005 and October 2005. Plaintiff contends that the ALJ should have relied on this additional medical evidence and that remand is appropriate to allow the ALJ to consider

these new records in his RFC assessment. She claims that these records would have altered the ALJ's decision to not give controlling weight to the opinion of Dr. Lesnak.

The October 2005 findings contain a recommendation from Dr. Lesnak that Plaintiff "refrain from repetitive motion activities involving her right upper extremity secondary to her radial neuropathy. [Dr. Lesnak] would also recommend no lifting more than 2-5 pounds with her right upper extremity secondary to this neuropathy." (Doc. # 20, Ex. B.) However, the ALJ stated that he did not give controlling weight to Dr. Lesnak's opinion, a decision that this Court finds is supported by substantial evidence. Thus, the additional records from Dr. Lesnak would be of dubious value to the ALJ on remand. Additionally, Ms. Pauline testified that jobs exist in the national economy, surveillance monitor and school bus monitor, even for a hypothetical person who could not do **any** handling, fingering or feeling with their dominant arm. Thus, even if the ALJ were to accept the limitations suggested by Dr. Lesnak in the additional records, the Court cannot say that the additional medical records would have caused the ALJ to reach a different conclusion regarding Plaintiff's disability. Given that exclusion of the additional records would not have altered the ALJ's decision, the Court need not address whether it was error to exclude them.

### D. The ALJ Properly Instructed the Vocational Expert

Plaintiff's final argument relates to the ALJ's instructions to the vocational expert, Ms. Pauline. Plaintiff contends that since the ALJ erred in calculating the RFC for the reasons described above, his instructions to Ms. Pauline based on his RFC assessment

were also deficient. However, since the Court finds that the ALJ's RFC assessment is supported by substantial evidence, this argument also fails. Moreover, the ALJ proposed multiple hypothetical limitations to Ms. Pauline, including one which contained an absolute limitation on the hypothetical person's ability to use the upper right extremity. Thus, although the ALJ did not accept Plaintiff's allegations regarding a complete inability to use her right arm, he did ask Ms. Pauline about a hypothetical person with Plaintiff's alleged limitations. As such, the deficiency that Plaintiff identifies the ALJ's RFC assessment was avoided by the additional hypotheticals provided to Ms. Pauline. Therefore, the Commissioner's decision is supported by substantial evidence on this point, as well.

## **CONCLUSION**

In sum, the Court finds that Plaintiff's challenges to the Commissioner's decision fail to persuade. The ALJ's decision not to give controlling weight to Plaintiff's treating physicians is supported by substantial evidence. Further, the ALJ properly assessed Plaintiff's RFC based on the objective medical evidence. The ALJ's determination that Plaintiff's subjective complaints are not completely credible is also supported by substantial evidence. The Court concludes that the four pages of additional medical records submitted by Plaintiff would not have affected the ALJ's decision. Finally, the ALJ properly instructed the vocational expert to determine whether jobs existed in the regional and national economies for a hypothetical person with Plaintiff's impairments.

Accordingly, it is

ORDERED that the Commissioner's decision is AFFIRMED.

DATED: March   18  , 2009

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge